# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

No. 13-40742

United States Court of Appeals
Fifth Circuit

**FILED**

August 19, 2014

Lyle W. Cayce
Clerk

UNITED STATES OF AMERICA,

Plaintiff - Appellee

v.

DAVID CHANCE LADOUCEUR,

Defendant - Appellant

Appeal from the United States District Court
for the Eastern District of Texas
USDC No. 4:12-CR-99

Before HIGGINBOTHAM, JONES, and PRADO, Circuit Judges.

PER CURIAM:*

David Chance Ladouceur was convicted under 18 U.S.C. § 922(g)(8) for possessing a firearm while being the subject of a domestic violence protective order. He appeals, alleging that the evidence was insufficient to prove he was an "intimate partner" of the protective order applicant because they never "cohabited" as required by the statute. Finding the evidence sufficient to support the jury's verdict, we affirm.

---

* Pursuant to 5TH CIR. R. 47.5, the court has determined that this opinion should not be published and is not precedent except under the limited circumstances set forth in 5TH CIR. R. 47.5.4.

No. 13-40742

I.

Ladouceur was indicted by a federal grand jury on May 9, 2012, in a single-count indictment charging "Possession of a Firearm and Ammunition by a Prohibited Person (Domestic Violence Protective Order)," in violation of 18 U.S.C. § 922(g)(8). A jury convicted him on February 14, 2013, after a two-day trial. The court sentenced him to forty-six months of imprisonment and three years of probation.

The evidence at trial showed the following. On July 20, 2010, Officer Brian Conrad responded to an incident at the Heritage Park Apartment Complex, during which he witnessed the apartment manager issue a criminal trespass warning against Ladouceur. Ladouceur's wife or ex-wife, Lorena Ladouceur, lived at the apartment complex. Trooper Kevin Lee Gaylon also lived at the complex as a duty officer, meaning he received reduced rent in exchange for responding off-duty to security disturbances. At 3:51 a.m. on August 28, 2010, he received a call from a concerned resident in the building, and looked outside to see Ladouceur trying to "get into" a vehicle.[1] Gaylon dressed in a "State Trooper" shirt and encountered Ladouceur in the hallway in front of Lorena Ladouceur's apartment. Gaylon told Ladouceur he was not supposed to be on the property, and Ladouceur responded that he knew that and was trying to find somebody to take him home. Gaylon approached closer and saw that there was a pistol in a clip holster lying on the ground in between Ladouceur's feet. Gaylon drew his own pistol and ordered Ladouceur away from the pistol on the ground, at which point Ladouceur walked away down the stairs and disappeared. Gaylon called the police department and took possession of the pistol, a Colt .25. Officer Benjamin Ray responded to the call and took possession of the pistol, which had a round in the chamber and six in

---

[1] There is no indication in the record that Ladouceur was trying to break into the vehicle, nor to whom the vehicle belonged.

the magazine. Gaylon spoke to Lorena Ladouceur later that morning, who stated that she knew Ladouceur was not supposed to be on the property but she had called him and asked him to bring the pistol to her apartment so she could pawn it for gas money. On September 2, Officer Hayth received a call from Lorena Ladouceur, who claimed that her gun had fallen out of her purse at the apartment complex and she wanted it returned. Hayth told her to come to the police station to discuss the matter, and did not hear from her again.

Ms. Jeliza Colorado also testified, pursuant to a trial subpoena, that she and Ladouceur dated from April to September 2008. She testified that Ladouceur stayed over at her apartment "most days out of the week," or "five to seven" days a week, while they dated, and that the relationship was exclusive for her but she suspected it was not for Ladouceur because he would talk about other girls. Ladouceur kept "clothing and whatever else he needed to get ready for work in the morning" at Colorado's apartment. Ladouceur had a lease on an apartment of his own but rarely stayed there while they were dating, and his name was not on Colorado's lease though he did have a key to her apartment. At least in the latter part of the relationship, Ladouceur was able to come and go as he pleased from Colorado's apartment. Ladouceur did not receive mail at Colorado's address and they did not have joint bills together or share financial assets. Colorado did not take Ladouceur to meet her family because they did not like tattoos and she testified that the relationship was short "because [Ladouceur] was abusive." She testified that Ladouceur would write her love letters and though the dating relationship was intimate it was not all about sex; they would hang out and spend their free time together. Ladouceur had referred to her as his girlfriend.

Colorado secured a protective order against Ladouceur on December 5, 2008, "after an incident occurred at [her] apartment." The order was in effect until December 5, 2010, and was obtained pursuant to a hearing at which Ladouceur appeared in person with counsel. The order found that Ladouceur

## No. 13-40742

had engaged in domestic violence against Colorado and restrained Ladouceur from communicating with Colorado in any manner. The order also expressly provided that pursuant to 18 U.S.C. § 922(g)(8), as Colorado is the "spouse, former spouse, parent of a child of the Respondent, or an individual with whom the Respondent cohabitates or has cohabited," Ladouceur was prohibited from possessing firearms or ammunition while the order was in effect. Colorado had no contact with Ladouceur after she obtained the protective order.

### II.

Ladouceur challenges only the sufficiency of the evidence to support his conviction. He faces an uphill battle, as we look only to the sufficiency of the evidence, not its credibility.[2] In reviewing such challenges, we ask "whether the evidence, when reviewed in the light most favorable to the government with all reasonable inferences and credibility choices made in support of a conviction, allows a rational trier of fact to find every element of the offense beyond a reasonable doubt."[3] If so, the verdict must stand.

### III.

Ladouceur claims that the evidence was insufficient to support the element of the crime that requires that he and Colorado were "intimate partners." 18 U.S.C. 922(g)(8) makes it unlawful for any person subject to a court order issued after a hearing that restrains the person from harassing or threatening an intimate partner, and which includes a finding that the person is a credible threat or explicitly prohibits the person from harming or threatening the intimate partner, from possessing any firearm or ammunition that has traveled in interstate commerce.[4] 18 U.S.C. § 921(a)(32) defines

---

[2] *United States v. Brown*, 553 F.3d 768, 780 (5th Cir. 2008).

[3] *United States v. Redd*, 355 F.3d 866, 872 (5th Cir. 2003) (internal citations omitted); *see also Jackson v. Virginia*, 443 U.S. 307 (1999).

[4] The full text reads:

"It shall be unlawful for any person—... who is subject to a court order that—

4

"intimate partner" as "the spouse of the person, a former spouse of the person, an individual who is a parent of a child of the person, and an individual who cohabitates or has cohabited with the person." As it is undisputed that Ladouceur and Colorado were never spouses and have no children together, the only issue is whether they "cohabited"—a term that is not defined by the statute.

It appears that no precedent from this or any other circuit has defined "cohabitation" for purposes of § 922(g)(8) or § 921(a)(32). Nevertheless, Ladouceur's claim must fail because ample evidence in the record supports the jury's finding that he and Colorado and Ladouceur cohabited. The jury instructions did not define cohabitation; rather, the jury was told that being "intimate partners" was an element of the crime and that "the term 'intimate partner' means, with respect to a person, the spouse of the person, a former spouse of the person, an individual who is a parent of a child of the person, or an individual who cohabitates or has cohabited with the person." The jury was entitled to determine 'cohabitation' from its experience in light of the evidence presented because "cohabitation" is not an arcane legal term incomprehensible to the general public.[5] The many dimensions of the word in various contexts

---

(A) was issued after a hearing of which such person received actual notice, and at which such person had an opportunity to participate;

(B) restrains such person from harassing, stalking, or threatening an intimate partner of such person or child of such intimate partner or person, or engaging in other conduct that would place an intimate partner in reasonable fear of bodily injury to the partner or child; and

(C)(i) includes a finding that such person represents a credible threat to the physical safety of such intimate partner or child; or

(ii) by its terms explicitly prohibits the use, attempted use, or threatened use of physical force against such intimate partner or child that would reasonably be expected to cause bodily injury....

* * *

to ship or transport in interstate or foreign commerce, or possess in or affecting commerce, any firearm or ammunition; or to receive any firearm or ammunition which has been shipped or transported in interstate or foreign commerce."

[5] *See United States v. Lippman*, 369 F.3d 1039, 1042 (8th Cir. 2004); *United States v. Anderton*, 629 F.2d 1044, 1048–49 (5th Cir. 1996) ("Terms which are reasonably within the

suggest it is a term better left to the expertise of the jury than cabined by an arbitrary standard.[6]  And the Government's reliance on case law interpreting "cohabiting" in the context of a different statute, 18 U.S.C. § 922(g)(9), is misplaced.  Section 922(g)(9) involves an element of the use or attempted use of physical force "by a person who is cohabiting with or has cohabited with the victim *as a spouse . . .* or by a person *similarly situated to a spouse.*"  But "cohabiting as a spouse"—what one court described as a relationship that "function[s] like a marriage"[7]—is something narrower than simply cohabiting, both in common understanding and to give effect to the different language in the two neighboring statutes.[8]

---

common understanding of juries, and which are not technical or ambiguous, need not be defined in the trial court's charge," but "[w]hen the instruction uses a term of legal significance, its meaning must be explained, especially when there is a request for clarifying instructions.").

[6] *Cf. United States v. Costigan*, 2000 WL 898455, at *4 (D. Me. June 16, 2000) ("With all respect, the [factual inquiry of 'cohabiting as a spouse' under *§ 922(g)(9)* is] not an easy task . . . .  What particular aspects of cohabiting or of a spousal relationship are required for unmarried people? Presumably a one-night sexual tryst would not qualify. But what about a week? A month? If two people explicitly say that they don't want to be married, but they proceed to live together, are they cohabiting 'as a spouse'? At what point in the relationship? What if one of them is separately maintaining a legal marriage with a third person? What about a long-term relationship where two people set up housekeeping together but the relationship is, or becomes, platonic? Gay partners? Is the answer different in a State like Hawaii where the Hawaii Supreme Court has recognized same-sex marriages and the State now allows same sex couples to register as 'reciprocal beneficiaries'? What about Vermont, which has recently enacted legislation that, although it does not recognize gay marriage, gives same-sex couples 'all the same benefits, protections and responsibilities under law ... as are granted to spouses in a marriage' through a 'civil union'? And whose perspective is considered? Two people who are spending time together or even cohabiting may have decidedly different views as to whether they are doing so 'as a spouse.' Is either one or both of their views determinative of, or relevant to, the outcome, or is the determination made by some kind of objective standard? If it is the latter, is the status to be determined by the laws of the particular State where the relationship or the violence occurred (some states recognize common law marriages; some do not) or is there some national definition of what it means to cohabit 'as a spouse'?") (internal citations omitted).

[7] *Costigan*, 2000 WL 898455, at *5 n.14.

[8] Cases interpreting § 922(g)(9), however, illuminate our inquiry insofar as relationships at issue there met the threshold of § 922(g)(9), "cohabiting as a spouse," where those relationships share characteristics with the relationship between Ladouceur and Colorado.  If those relationships met a narrower standard of "cohabiting as a spouse," it reinforces our conclusion that a rational jury could find the one here met a broader standard

No. 13-40742

Here, ample evidence presented at trial supports a rational jury's finding that Ladouceur and Colorado cohabited. The evidence showed that the two had a relationship as boyfriend and girlfriend that went beyond casual dating. During this time, over the span of several months, Ladouceur stayed over at Colorado's apartment most or often all days out of the week; he kept clothing and personal effects there to go directly to work in the mornings; he had a key to her apartment and was able to come and go as he pleased; and he rarely visited an apartment leased under his own name. Our review of the record reveals no reason this verdict should not be upheld, and so it is.

IV.

For the reasons stated above, we AFFIRM Ladouceur's conviction.

---

for simply "cohabiting." This Court held that a defendant's admission that the victim was his "live-in girlfriend" of two months indicates the two were living together with the implication of sexual relations, which was "sufficient evidence to prove the victim was similarly situated to a spouse in the context of [§ 922(g)(9)]." *United States v. Shelton*, 325 F.3d 553, 563 (5th Cir. 2003). The defendant there admitted the victim was his "live-in girlfriend", while Ladouceur contests this characterization. But testimony that he stayed at Colorado's apartment five or more nights a week, and that it lasted four months instead of two, makes it akin to the live-in relationship found sufficient in the prior case. Other circuits agree that abuse perpetrated on a live-in girlfriend is domestic abuse "by a person similarly situated to a spouse" for purposes of § 922(g)(9) and § 921(a)(33)(A)(ii). *See Buster v. United States*, 447 F.3d 1130, 1133 (8th Cir. 2006); *United States v. Denis*, 297 F.3d 25, 31 (1st Cir. 2002). *See also White v. Dep't of Justice*, 328 F.3d 1361, 1369 (Fed. Cir. 2003) (holding that the defendant was a person similarly situated to a spouse where he and the victim cohabited as boyfriend and girlfriend for ten months, and thereafter maintained an intermittent relationship for several months in which the defendant stayed "up to 5 days/nights a week with her" although he maintained a separate residence; the initial ten month period was "continuous, complete cohabitation" and the subsequent months were "substantial cohabitation.").